

225-07/PJG

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
Peter J. Gutowski (PG 2200)
Barbara G. Carnevale (BG 1651)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

MUR SHIPPING BV,

                                   Plaintiff,

          -against -                                  **VERIFIED COMPLAINT**

GIMPRO NEGOCE,

                                   Defendant.
-------------------------------------------------------------------x

     Plaintiff MUR SHIPPING BV ("MUR"), by its attorneys Freehill Hogan & Mahar, LLP,

as and for its Verified Complaint against Defendant GIMPRO NEGOCE ("GIMPRO"), alleges

upon information and belief as follows:

     1.   This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime contract.

The case also falls within the Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C.

§1333, and the Court's federal question jurisdiction pursuant to 28 U.S.C. §1331.  Federal

jurisdiction also exists because the action arises under the New York Convention on the

Recognition and Enforcement of Foreign Arbitral Awards at 9 U.S.C. §201 *et seq.* and/or the

Federal Arbitration Act, 9 U.S.C. §1 *et seq.*

2.    At all times material hereto, Plaintiff MUR was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at Atrium Building, Strawinskylaan, 3011, NL 10077 ZX, Amsterdam, The Netherlands.

3.    At all times material hereto, Defendant GIMPRO was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at 42-48 Rue des Mousses, 13008 Marseille, France.

4.    On or about August 8, 2005, Plaintiff MUR, as owner, and GIMPRO, as charterer, entered into a maritime contract of charter party a/k/a a contract of affreightment for the chartering of multiple vessels, to be nominated by the Plaintiff MUR, for carriage of six shipments of bagged cement during the period of October 1, 2005 through December 31, 2006 (hereinafter the "COA""), a true and accurate copy of which is annexed hereto as Exhibit A.

5.    Pursuant to the above-referenced COA, MUR nominated the M/V SEA BREEZE for one of the voyages, which vessel was accepted by Defendant GIMPRO and went into GIMPRO's service under the COA on or about November, 2005 at the loadport of Kandla.

6.    The voyage was performed, but disputes arose concerning GIMPRO's liability for deadfreight and demurrage totaling $177,783.61.

7.    By agreement, those disputes were submitted to London arbitration in accordance with the LMAA Small Claims procedures.

8.    Following the submissions of the parties to the arbitration tribunal, the tribunal rendered an Arbitration Award (hereinafter the "Award") in MUR's favor and against GIMPRO on January 8, 2007, a true and accurate copy of which is annexed hereto as Exhibit B.

9.   The Award in favor of MUR and against GIMPRO included the principal sum of USD $177,783.61, plus interest and costs, as follows:

i.   Principal sum due under the Award **USD $177,783.61;**

ii.   Interest on principal sum at the rate of 7% per annum as specified in the Award compounded quarterly from the date specified in the Award, December 1, 2006 through June 7, 2007 (end of the current "monthly rest"), which totals **USD $6,276.87;**

iii.   Costs of the prosecution of the award and the costs of the arbitrator in the total sum of £3,500, which equals **USD $7,002.14** at the prevailing rate of exchange;

iv.   Interest on the amount due in Paragraph iii above computed as per the terms of the Award (i.e. from September 1, 2006 with respect to interest on the costs of the arbitrator and from January 8, 2007 on the Owner's costs) through June 1, 2007, for a total sum of **$216.75.**

v.   Interest on the total of items (i) - (iv) above from the calculated date of June 1, 2007 though the anticipated completion of this litigation (2 years) at the rate of 7.5% per and anticipated costs and fees in collection and enforcement for a total sum of **USD $48,691.04;**

10.  Despite due demand, GIMPRO has not paid the amounts due and outstanding under the award, and the amount remains due and owing to MUR.

11.  In addition to the amounts due as aforesaid, there is a further outstanding claim under the COA for demurrage in the sum of $25,992 which was initially not disputed by the Defendant and thus not submitted to the London tribunal or incorporated into the Award, but later disputed by Defendant GIMPRO and now the subject of a further claim.

12. The above-referenced claim for demurrage, together with interest on that claim which equals USD$3,638.88 (computed for the period January 1, 2006 at the rate of 7%, the same amount awarded in the initial award, for a period of two years), together with anticipated costs and fees in prosecuting the demurrage claim (all of which are recoverable in London arbitration) brings the total demurrage claim to $36,630.88.

13. Plaintiff MUR has fulfilled all obligations required of it under the COA.

14. This action is brought to obtain jurisdiction over Defendant GIMPRO, to confirm and enforce the existing Award, to obtain security for execution on the judgment to be entered on the existing Award, as well as to compel the defendant's appearance in the second arbitration for the open demurrage claim and to obtain security for that second claim against Defendant GIMPRO as outlined above.

15. This Verified Complaint is filed subject to and without waiver of any arbitration rights which might exist by virtue of the COA and/or any other agreement relating thereto for the adjudication of disputes.

16. Upon information and belief, and after investigation, Defendant GIMPRO cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendant has, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendant GIMPRO (collectively hereinafter, "ASSETS"), including but not limited to ASSETS as may be held, received or transferred for its benefit at, moving through, or within the possession, custody or control of banking institutions including but not limited to ABN Amro, American Express Bank,

Bank of America, BNP Paribas, Citibank, Deutsche Bank Trust Co., HSBC, HSBC USA Bank NA, JPMorgan Chase Bank, Standard Chartered Bank; The Bank of New York and Wachovia Bank, and and/or other institutions or such other garnishees whose identities become known to Plaintiff's counsel in the future.

17. The total mount to be attached pursuant to the calculations set forth in Paragraphs 9 and 12 above is **$276,601.29**.

WHEREFORE, Plaintiff MUR prays:

a.     That process in due form of law according to the practice of this Court issue against Defendant GIMPRO, citing it to appear and answer the foregoing, failing which a default will be taken against it for the amounts of the claim as set forth in the Award and as set forth above, plus interest, costs and attorneys fees.

b.     That if Defendant GIMPRO cannot be found within this District pursuant to Supplemental Rule B that all tangible or intangible property of Defendant GIMPRO, up to and including the claim of **USD $276,601.29** be restrained and attached, including, but not limited to any cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or being transferred from or for the benefit of Defendant GIMPRO (collectively hereinafter, "ASSETS"), including but not limited to such ASSETS as may be held, received, or transferred at, moving through, or within the possession, custody or control of banking institutions including but not limited to ABN Amro, American Express Bank, Bank of America, BNP Paribas, Citibank, Deutsche Bank Trust Co., HSBC, HSBC USA Bank NA, JPMorgan Chase Bank, Standard Chartered Bank; The Bank of New York and Wachovia Bank, and/or other institutions

or such other garnishees that may be subsequently identified and upon whom a copy of the

Process of Maritime Attachment and Garnishment issued herein be served;

      c.     That this Court determine and adjudge Plaintiff entitled to enforce the Award and

enter judgment in Plaintiff's favor thereon and against Defendant in the amount of the Award,

plus interest, costs, and the additional recoverable sums due, and otherwise recognize, confirm

and enter judgment on the subject Award; and

      d.     That Plaintiff MUR have such other, further and different relief as this Court may

deem just and proper in the premises including but not limited to an order compelling and

directing the Defendant to arbitrate the remaining demurrage claim, and that the Court retain

jurisdiction for purposes of a subsequent order enforcing that award.


Dated:  New York, New York
        April 30, 2007


                                FREEHILL HOGAN & MAHAR, LLP
                                Attorneys for Plaintiff
                                MUR SHIPPING BV


                                By:
                                  Peter J. Gutowski (PG 2200)
                                Barbara G. Carnevale (BG 1651)
                                80 Pine Street
                                New York, NY  10005
                                (212) 425-1900
                                (212) 425-1901 fax

## ATTORNEY VERIFICATION

STATE OF NEW YORK   )
                     ) ss.:
COUNTY OF NEW YORK )

PETER J. GUTOWSKI, being duly sworn, deposes and says as follows:

1.    I am a partner with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2.    The sources of my information and the grounds for my belief are communications, information and documentation provided by our client and its solicitors.

3.    The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

_____
PETER J. GUTOWSKI

Sworn to before me this
30th day of April, 2007.

_____

JOAN SORRENTINO
Notary Public, State of New York
No. 01SO6067227
Qualified in New York County
Commission Expires December 3, 2009

| 1. Shipbroker | RECOMMENDED |
|---|---|
| JOLASRY (FRANCE)<br>45 BOULEVARD DE LA PAIX<br>92400 PARIS COURBEVOIE<br>FRANCE | THE BALTIC AND INTERNATIONAL MARITIME CONFERENCE<br>UNIFORM GENERAL CHARTER (AS REVISED 1922 and 1976)<br>INCLUDING "F.I.O." ALTERNATIVE, ETC.<br>(To be used for trades for which no approved form is in force)<br>CODE NAME: "GENCON"  Part I |

| 3. Owners/Place of business (Cl. 1) | 2. Place and date  LONDON, 9TH AUGUST 2005 |
|---|---|
| MUR SHIPPING BV<br>ATRIUM BUILDING<br>STRAWINSKYLAAN, 3011<br>NL 1077 ZX, AMSTERDAM<br>THE NETHERLANDS | 4. Charterers/Place of business (Cl. 1)<br>GIMPRO NEGOCE<br>42-48 RUE  DES MOUSSES,<br>13008 MARSEILLE<br>FRANCE |

| 5. Vessel Name (Cl. 1) | 6. GRT/NRT (Cl. 1) |
|---|---|
| MUR "TBN"  (SEE CLAUSE 24) | |

| 7. Deadweight cargo carrying capacity in tons (abt.) (Cl. 1) | 8. Present position (Cl. 1) |
|---|---|
| | |

| 9. Expected ready to load (abt.) (Cl. 1) | |
|---|---|
| | |

| 10. Loading port or place (Cl. 1) | 11. Discharging port or place (Cl. 1) |
|---|---|
| 1 SAFE BERTH MUNDRA OR 1 SAFE BERTH KANDLA<br>OR 1 SAFE BERTH SANGI IN CHARTERER'S OPTION<br>(SEE CLAUSE 27) | 1 SAFE BERTH MAYOTTE+ 1 SAFE ANCHORAGE<br>MORONI  AND/OR 1 SAFE BERTH MUTSAMUDU |

| 12. Cargo (also state quantity and margin in Owners' option, if agreed; if full and complete cargo not agreed state "part cargo") (Cl. 1) |
|---|
| CONTRACT OF AFFREIGHTMENT COMMENCING 1ST OCTOBER 2005 TO 31ST DECEMBER 2005 COMPRISING OF 100,000 METRIC TONS 10 PER CENT MORE OR LESS IN OWNER'S OPTION BAGGED CEMENT.  SIX SHIPMENTS OF 16-18,000 METRIC TON SIZES, EXACT QUANTITY TO BE LOADED WILL BE ADVISED BY OWNER WHEN NOMINATING VESSEL.  (SEE CLAUSE 30) |

| 13. Freight rate (also state if payable on delivered or intaken quantity) (Cl. 1) | 14. Freight payment (state currency and method of payment; also beneficiary and bank account) (Cl. 4) |
|---|---|
| BASE FREIGHT RATE: US$36.00  PER METRIC TON ON<br>GROSS TONNAGE FREE IN AND OUT BASIS 1-2,<br>LASHED, SECURED AND DUNNAGED.   (SEE CLAUSE 18) | 100% FREIGHT TO BE PAID PRIOR VESSEL'S ARRIVAL<br>COMOROS AND BEFORE COMMENCEMENT OF DISCHARGE.<br>BILLS OF LADING MARKED "FREIGHT PAYABLE AS PER C/P".<br>(SEE CLAUSE 18) |

| 15. Loading and discharging costs (state alternative (a) or (b) of Cl. 5; also indicate if vessel is gearless | 16. Laytime (if separate laytime for load and disch. is agreed, fill in a) and b). If total laytime for load and disch., fill in c) only) (Cl. 6) |
|---|---|
| F.I.O.S. LASHED, SECURED, DUNNAGED.<br>ANY LASHING/DUNNAGE/KRAFT PAPER REQUIRED<br>FOR SAFE CARE OF CARGO TO BE FOR CHARTERER'S<br>ACCOUNT. | a)   Laytime for loading<br>SEE CLAUSE 20 |

| 17. Shippers (state name and address) (Cl. 6) | b)   Laytime for discharge<br>SEE CLAUSE 20 |
|---|---|
| SANGHI INDUSTRIES LIMITED | c) Total laytime for loading and discharging |

| 18. Demurrage rate (loading and discharging) (Cl. 7) | 19. Cancelling date (Cl. 10) |
|---|---|
| US$12,000 PER DAY OR PRO RATA HALF DESPATCH<br>WORKING TIME SAVED BOTH ENDS (SEE CLAUSE 32) | SEE CLAUSE 31 |

| 20. Brokerage commission and to whom payable (Cl. 14) |
|---|
| 2.5% TO JOLASRY (FRANCE) |

| 21. Additional clauses covering special provisions, if agreed. |
|---|
| CLAUSES 18 - 37 TO BE DEEMED FULLY INCORPORATED TO FORM PART OF THIS CHARTER-PARTY. |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include Part I as well as Part II. In the event of a conflict of conditions, the provisions of Part I shall prevail over those of Part II to the extent of such conflict.



| Signature (Owners) | Signature (Charterers) |
|---|---|
| Re-said on behalf of owners<br>By Telegraphic Authority<br>MUR SHIPPING<br>LONDON LIMITED | For the Charterers<br>by telephone authority<br>JOLASRY (FRANCE)<br>45, boulevard de la paix<br>92400 GIMPRON...<br>as brokers |

EXHIBIT
A

PART II
"Gencon" Charter (As Revised 1922 and 1976)
Including "F.I.O." Alternative, etc.

1. It is agreed between the party mentioned in Box 3 as Owners of the
steamer or motor vessel named in Box 5, of the gross/net Register
tons Indicated in Box 6 and carrying about the number of tons of
deadweight cargo stated in Box 7, now in position as stated in Box 8
and expected ready to load under this Charter about the date in-
dicated in Box 9, and the party mentioned as Charterers in Box 4
that:
The said vessel shall proceed to the loading port or place stated
in Box 10 or so near thereto as she may safely get and lie always
afloat, and there load a full and complete cargo (if shipment of deck
cargo agreed same to be at Charterers' risk) as stated in Box 12
(Charterers to provide all nets and/or wood for dunnage and any
separations required, the Owners allowing the use of any dunnage
wood on board if required) which the Charterers bind themselves to
ship, and being so loaded the vessel shall proceed to the discharg-
ing port or place stated in Box 11 as ordered on signing Bills of
Lading or so near thereto as she may safely get and lie always
afloat and there deliver the cargo on being paid freight on delivered
or intaken quantity as indicated in Box 13 at the rate stated in
Box 13.

2. Owners' Responsibility Clause
Owners are to be responsible for loss of or damage to the goods
or for delay in delivery of the goods only in case the loss, damage
or delay has been caused by the improper or negligent stowage of
the goods (unless stowage performed by shippers/Charterers or their
stevedores or servants) or by personal want of due diligence on the
part of the Owners or their Manager to make the vessel in all respects
seaworthy and to secure that she is properly manned, equipped and
supplied or by the personal act or default of the Owners or their
Manager.
And the Owners are responsible for no loss or damage or delay
arising from any other cause whatsoever, even from the neglect or
default of the Captain or crew or some other person employed by the
Owners on board or ashore for whose acts they would, but for this
clause, be responsible, or from unseaworthiness of the vessel on
loading or commencement of the voyage or at any time whatsoever.
Damage caused by contract with or leakage, smell or evaporation
from other goods or by the inflammable or explosive nature or in-
sufficient package of other goods not to be considered as caused
by improper or negligent stowage, even if in fact so caused.

3. Deviation Clause
The vessel has liberty to call at any port or ports in any order, for
any purpose, to sail without pilots, to tow and/or assist vessels in
all situations, and also to deviate for the purpose of saving life and/or
property.

4. Payment of Freight                    SEE CLAUSE 18
The freight to be paid in the manner prescribed in Box 14 in cash
without discount on delivery of the cargo at mean rate of exchange
ruling on day or days of payment, the receivers of the cargo being
bound to pay freight on account during delivery, if required by Cap-
tain or Owners.
Cash for vessel's ordinary disbursements at port of loading to be
advanced by Charterers if required at highest current rate of ex-
change, subject to two per cent, to cover insurance and other ex-
penses.

5. Loading/Discharging Costs
*(a) Gross Terms
The cargo to be paid brought alongside in such a manner as to enable
vessel to take the goods with her own tackle. Charterers to procure
and pay the necessary men on shore or on board the lighters to do
the work there, vessel only heaving the cargo on board.
If the loading takes place by elevator, cargo to be put free in vessel's
holds, Owners only paying trimming expenses.
Any pieces and/or packages of cargo over two tons weight, shall be
loaded, stowed and discharged by Charterers at their risk and expense.
The cargo to be received by Merchants at their risk and expense
alongside the vessel not beyond the reach of her tackle.
*(b) F.I.o. and free stowed/trimmed.
The cargo shall be brought into the holds, loaded, stowed and/or trim-
med and taken from the holds and discharged by the Charterers or
their Agents, free of any risk, liability and expense whatsoever to the
Owners.
The Owners shall provide winches, motive power and winchmen from
the Crew if requested and permissible (not, the Charterers shall
provide and pay for winchmen from shore and/or cranes, if any. This
provision shall not apply if vessel is gearless and/or such is the
case).
*Indicate alternative (a) or (b), as agreed, in Box 15.

6. Laytime                    SEE CLAUSE 20
*(a) Separate laytime for loading and discharging
The cargo shall be loaded within the number of running hours as
indicated in Box 16, weather permitting, Sundays and holidays ex-
cepted, unless used, in which event time actually used shall count.
The cargo shall be discharged within the number of running hours
as indicated in Box 16, weather permitting, Sundays and holidays ex-
cepted, unless used, in which event time actually used shall count.
*(b) Total laytime for loading and discharging
The cargo shall be loaded and discharged within the number of total
running hours as indicated in Box 16, weather permitting, Sundays and
holidays excepted, unless used, in which event time actually used
shall count.
(c) Commencement of laytime (loading and discharging)
Laytime for loading and discharging shall commence at 1 p.m. if
notice of readiness is given before noon, and at 6 a.m. next working
day if notice given during office hours. Notice at loading
port to be given to the Shippers named in Box 17.
Time actually used before commencement of laytime shall count.
Time lost in waiting for berth to count as loading or discharging
time, as the case may be.
*Indicate alternative (a) or (b) as agreed, in Box 16.

7. Demurrage
Ten running days on demurrage at the rate stated in Box 18 per
day or pro rata for any part of a day payable day by day to be
allowed Merchants altogether at ports of loading and discharging.

8. Lien Clause
Owners shall have a lien on the cargo for freight, dead-freight,
demurrage and damages for detention. Charterers shall remain re-
sponsible for dead-freight and demurrage (including damages for
detention), incurred at port of loading. Charterers shall also remain
responsible for freight and demurrage (including damages for deten-
tion) incurred at port of discharge, but only to such extent as the
Owners have been unable to obtain payment thereof by exercising
the lien on the cargo.

9. Bills of Lading
The Captain to sign Bills of Lading at such rate of freight as
presented without prejudice to this Charterparty, but should the
freight by Bills of Lading amount to less than the total chartered
freight the difference to be paid to the Captain in cash on signing
Bills of Lading.

AGREED LAYCAN FOR EACH SHIPMENT NOMINATION

10. Cancelling Clause
Should the vessel not be ready to load (whether in berth or not) on
or before the date indicated in Box 19, Charterers have the option
of cancelling this contract, such option to be declared, if demanded,
at least 48 hours before vessel's expected arrival at port of loading.
Should the vessel be delayed on account of average or otherwise,
Charterers to be informed as soon as possible, and if the vessel is
delayed for more than 10 days after the day she is stated to be
expected ready to load, Charterers have the option of cancelling this
contract, unless a cancelling date has been agreed upon.

THE SHIPMENT                    IN LONDON

11. General Average
General average to be settled according to York-Antwerp Rules,
1974. Proprietors of cargo to pay the cargo's share in the general
expenses even if same have been necessitated through neglect or
default of the Owners' servants (see clause 2).

AND SUBSEQUENT UPDATES

12. Indemnity
Indemnity for non-performance of this Charterparty, proved damages,
not exceeding estimated amount of freight.

13. Agency
In every case the Owners shall appoint his own Broker or Agent both
at the port of loading and the port of discharge.
APPOINT THEIR OWN AGENTS AT DISCHARGE PORT

14. Brokerage
A brokerage commission at the rate stated in Box 20 on the freight
earned is due to the party mentioned in Box 21.
In case of non-execution of/least 1/3 of the brokerage on the estimated
amount of freight and dead-freight to be paid by the Owners. In case
Brokers an indemnity for the Owner's expenses and work. In case of
more voyages the amount of indemnity to be mutually agreed.

15. GENERAL STRIKE CLAUSE
Neither Charterers nor Owners shall be responsible for the con-
sequences of any strikes or lock-outs preventing or delaying the
fulfilment of any obligations under this contract.
If there is a strike or lock-out affecting the loading of the cargo,
or any part of it, when vessel is ready to proceed from her last port
or at any time during the voyage to the port or ports of loading or
after her arrival there, Captain or Owners may ask Charterers to
declare, that they agree to reckon the laydays as if there were no
strike or lock-out. Unless Charterers have given such declaration in 
writing (by telegram, if necessary) within 24 hours, Owners shall
have the option of cancelling this contract. If part cargo has already
been loaded, Owners must proceed with same, (freight payable on
loaded quantity only) having liberty to complete with other cargo
on the way for their own account.
If there is a strike or lock-out affecting the discharge of the cargo
on or after vessel's arrival at or off port of discharge and same has not
been settled within 48 hours, Receivers shall have the option of
keeping vessel waiting until such strike or lock-out is at an end
against paying half demurrage after expiration of the time provided
for discharging, or of ordering the vessel to a safe port where she
can safely discharge without risk of being detained by strike or lock-
out. Such orders to be given within 48 hours after Captain or Owners
have given notice to Charterers of the strike or lock-out affecting
the discharge. On delivery of the cargo at such port, all conditions
of this Charterparty and of the Bill of Lading shall apply and vessel
shall receive the same freight as if she had discharged at the first
original port of destination, except that if the distance of the sub-
stituted port exceeds 100 nautical miles, the freight on the cargo
delivered at the substituted port to be increased in proportion.

16. War Risks ("Voywar 1950")                    SEE CLAUSE 36
(1) In these clauses "War Risks" shall include any blockade of any
action which is announced as a blockade by any Government or by any
belligerent or by any organized body, sabotage, piracy, and any actual
or threatened war, hostilities, warlike operations, civil war, civil com-
motion, or revolution.
(2) If at any time before the Vessel commences loading, it appears that
performance of the contract will subject the Vessel or her Master and
crew or her cargo to war risks at any stage of the operation, the Owners
shall be entitled by letter or telegram despatched to the Charterers, to
cancel this Charter.
(3) The Master shall not be required to load cargo or to continue
loading or to proceed on or to sign Bills of Lading for any adventure
on which or any port at which it appears that the Vessel, her Master
and crew or her cargo will be subjected to war risks. In the event of
the exercise by the Master of his right under this Clause after part or
full cargo has been loaded, the Master shall be at liberty either to the
discharge such cargo at the loading port or to proceed therewith. In
the latter case the Vessel shall have liberty to carry other cargo for
Owners' benefit and accordingly to proceed to and load or sign
discharge such other cargo at any other port or ports whatsoever,
backwards or forwards, although in a contrary direction to or out of or
beyond the ordinary route. In the event of the Master electing to load
proceed with part cargo under this Clause freight shall in any case
be payable on the quantity delivered.
(4) If at the time the Master elects to proceed with part or full cargo
under Clause 3, or after the Vessel has left the loading port, or the

PART II

"Gencon" Charter (As Revised 1922 and 1976)

Including "F.I.O." Alternative, etc.

---

performance of the contract will subject the Vessel, her Master and 205
crew or her cargo, to war risks, the cargo shall be discharged, or if 206
the discharge has been commenced shall be completed, at any safe 207
port in vicinity of the port of discharge as may be ordered by the 208
Charterers, if no such orders shall be received from the Charterers 209
within 48 hours after the Owners have dispatched a request by 210
telegram to the Charterers for the nomination of a substitute dischar- 211
ging port, the Owners shall be at liberty to discharge the cargo at 212
any safe port which they may, in their discretion, decide on and such 213
discharge shall be deemed to be due fulfilment of the contract of 214
affreightment. In the event of cargo being discharged at any such 215
other port, the Owners shall be entitled to freight as if the discharge 216
had been effected at the port or ports named in the Bill(s) of Lading 217
or to which the Vessel may have been ordered pursuant thereto. 218
219

(b) (a) The Vessel shall have liberty to comply with any directions 220
or recommendations as to loading, departure, arrival, routes, ports 221
of call, stoppages, destination, zones, waters, discharge, delivery or 222
in any other wise whatsoever (including any direction or recom- 223
mendation not to go to the port of destination or to delay proceeding 224
thereto or to proceed to some other port) given by any Government or 225
by any belligerent or by any organized body engaged in civil war, 226
hostilities or warlike operations or by any person or body acting or 227
purporting to act as or with the authority of any Government or 228
belligerent or of any such organized body or by any committee or 229
person having under the terms of the war risks insurance on the 230
Vessel, the right to give any such directions or recommendations. If, 231
by reason of or in compliance with any such direction or recom- 232
mendation, anything is done or is not done, such shall not be deemed 233
a deviation. 234

(b) If, by reason of or in compliance with any such directions or re- 235
commendations, the Vessel does not proceed to the port or ports 236
named in the Bill(s) of Lading or to which she may have been 237
ordered pursuant thereto, the Vessel may proceed to any port as 238
directed or recommended or to any safe port which the Owners in 239
their discretion may decide on and there discharge the cargo. Such 240
discharge shall be deemed to be due fulfilment of the contract of 241
affreightment and the Owners shall be entitled to freight as if 242
discharge had been effected at the port or ports named in the Bill(s) 243
of Lading or to which the Vessel may have been ordered pursuant 244
thereto. 245

(c) All extra expenses (including insurance costs) involved in discharg- 246
ing cargo at the loading port or in reaching or discharging the cargo 247
at any port as provided in Clauses 4 and 5 (b) hereof shall be paid 248
by the Charterers and/or cargo owners, and the Owners shall have 249
a lien on the cargo for all moneys due under these Clauses. 250

**17. GENERAL ICE CLAUSE** 251
*Port of loading* 252

(a) In the event of the loading port being inaccessible by reason of 253
ice when vessel is ready to proceed from her last port or at any 254
time during the voyage or on vessel's arrival or in case frost sets in 255
after vessel's arrival, the Captain for fear of being frozen in is at 256
liberty to leave without cargo, and this Charter shall be null and 257
void. 258

(b) If during loading the Captain, for fear of vessel being frozen in, 259
deems it advisable to leave, he has liberty to do so with what cargo 260
he has on board and to proceed to any other port or ports with 261
option of completing cargo for Owners' benefit for any port or ports 262
including port of discharge. Any part cargo thus loaded under this 263
Charter to be forwarded to destination at vessel's expense but 264
against payment of freight, provided that no extra expenses be 265
thereby caused to the Receivers, freight being paid on quantity 266
delivered (in proportion if lumpsum), all other conditions as per 267
Charter. 268

(c) In case of more than one loading port, and if one or more of 269
the ports are closed by ice, the Captain or Owners to be at liberty 270
either to load the part cargo at the open port and fill up elsewhere 271
for their own account as under section (b) or to declare the Charter 272
null and void unless Charterers agree to load full cargo at the open 273
port. 274

(d) This Ice Clause not to apply in the Spring. 275

*Port of discharge* 276

(a) Should ice (except in the Spring) prevent vessel from reaching 277
port of discharge Receivers shall have the option of keeping vessel 278
waiting until the re-opening of navigation and paying demurrage, or 279
of ordering the vessel to a safe and immediately accessible port 280
where she can safely discharge without risk of detention by ice. 281
Such orders to be given within 48 hours after Captain or Owners 282
have given notice to Charterers of the impossibility of reaching port 283
of destination. 284

(b) If during discharging the Captain for fear of vessel being frozen 285
in deems it advisable to leave, he has liberty to do so with what 286
cargo he has on board and to proceed to the nearest accessible 287
port where she can safely discharge. 288

(c) On delivery of the cargo at such port, all conditions of the Bill 289
of Lading shall apply and vessel shall receive the same freight as 290
if she had discharged at the original port of destination, except that if 291
the distance of the substituted port exceeds 100 nautical miles, the 292
freight on the cargo delivered at the substituted port to be increased 293
in proportion. 294

Printed and sold by S. Straker & Sons Ltd., 47–51 Gt. Suffolk Street, SE1.   Tel: 01-928 8769   Tlx: 23369   Fax: 01-633 0281.
by authority of The Baltic and International Maritime Conference, (BIMCO) Copenhagen.

ADDITIONAL CLAUSES TO THE MUR/GIMPRO
CONTRACT OF AFFREIGHTMENT
DATED LONDON 9TH AUGUST 2005

**Clause 18**

Base freight rate is USD 36.00 per gross metric ton free in and out basis 1-2, lashed, secured and dunnaged.

Freight is based upon cargo distribution and corresponding laytime of 12,500 metric tons sling/big bags at a discharge rate of 1,500 metric tons per weather working day of 24 hours, time not to count from Saturday noon or noon a day preceding a holiday until 0800 hours Monday or 0800 hours the next working day following a holiday even if used and 3,500 metric tons loose bags at 750 metric tons per weather working day time not to count from Saturday noon or noon a day preceding a holiday until 0800 hours Monday or 0800 hours the next working day following a holiday even if used.

Freight is to be adjusted pro rata up/down according to each shipment tonnage of sling big bags/loose bags and their respective 1,500/750 discharge rate3. For additional laytime needed over base rate (USD 36.00/16,000 metric tons/1500X/750X) freight to be increased by an equivalent of USD12,000 per day paid along with the freight. For less laytime needed, freight to be reduced by an equivalent of USD 12,000 per day. Charterers are to declare their shipment option upon ship nomination.

The Charterers have the option to discharge at all three ports paying for extra cost basis one extra day at demurrage rate of USD12,000 per day.

Base freight rate shall be increased to USD37.00 per metric ton if nominated vessel needs to ballast to load port from further afield than Mumbai or Karachi

100% freight is to be paid prior vessel's arrival Comoros and definitely prior commencement of discharge. Bills of Lading to be marked 'freight payable as per C/P'.

Charterers to have the option to request 'freight prepaid' Bills of Lading in which case freight to be 100% prepaid prior releasing of such 'freight prepaid' Bills of Lading.

Full freight deemed earned as cargo being loaded and to be paid to disponent owners, MUR, discountless, non-returnable, vessel and or cargo lost or not lost.

**Clause 19**

In the event of non-availability of original Bills of Lading upon vessel's arrival at discharging port, Owners to permit vessel to commence discharging operations upon receipt of Charterers letter of Indemnity in Owners P & I Club standard format signed by Charterers and receivers only, no bank guarantee. Shipowners to retain the right to halt discharge when 3,000 tons of cargo left onboard if original Bills of Lading have not by then been presented to Master/Owner and time shall continue to count.

**Clause 20**

Load Rate: 3,000 metric tons per weather working day Sundays and holidays included.

Upon arrival Master/Owners may tender notice of readiness whether in berth or not, whether in port or not, whether in free pratique or not, whether customs cleared or not and time will count after 12 hours unless sooner commenced in which case time used to count.

1

ADDITIONAL CLAUSES TO THE MUR/GIMPRO
CONTRACT OF AFFREIGHTMENT
DATED LONDON 9TH AUGUST 2005

Clause 20 (cont'd)

Discharge Rate:1,500 metric tons per weather working day of 24 hours, time not to count from Saturday noon or noon a day preceding a holiday until 0800 hours Monday or 0800 hours the next working day following a holiday even if used for sling/big bags and 750 metric tons per weather working day time not to count from Saturday noon or noon a day preceding a holiday until 0800 hours Monday or 0800 hours the next working day following a holiday even if used for loose bags.

Extreme weather delays such as swell/torrential rain/volcano eruptions preventing discharge operations are to be shared equally for any such period preventing discharge for more than 12 consecutive hours. Demurrage rate is to be used to calculate the share.

At first discharge port time starts to count at 1300 hours if Notice of Readiness given before noon and at 0700 hours next day if Notice of Readiness given after noon. Notice of Readiness is always to be given within office hours, whether in port or not, whether in berth or not, whether customs cleared or not, whether in free pratique or not. Time used before commencement of laytime not to count.

At second and third discharge ports time to count immediately upon arrival.

All discharging ports to count as one port.

Clause 21

Port costs at loading port to be for Owner's account. Costs of loading/stevedoring to be for Charterer's account. Charterers are to pay customary port expenses at discharging ports, including agency commission.

Owner's agents at load port and Charterer's agents at discharge ports.

Clause 22

For vessels up to 25 years of age, extra insurance, if any, due to vessel's class, age, flag to be for Charterers account.

Clause 23

Any taxes on cargo to be for Charterers account.

Freight tax to be for Shipowner's account. Any taxes on vessel to be for Shipowner's account.

Clause 24

Vessel Description:-

MUR ships to be nominated
Ships to be nominated, owned, managed or chartered
Classed Lloyds 100 A1 or equivalent
Fully P & I covered
Minimum 10 ton cranes, ship to have 1 crane to serve each hatch simultaneously.
Maximum 25 years free of additional cargo insurance premium due to age, class or flag.
Tweendecker or singledecker in Owner's option.

2

ADDITIONAL CLAUSES TO THE MUR/GIMPRO
CONTRACT OF AFFREIGHTMENT
DATED LONDON 9TH AUGUST 2005

**Clause 25**

If published U.A.E. price of IFOIL 180 cst falls below USD270 per metric ton at time of performing ship's bunker stem being arranged then Charterers to be reimbursed for savings made. If price more then Charterers to pay difference

**Clause 26**

Should the Baltic Exchange London BHMI Shipping Index rise above USD20,000 per day during the currency of this contract then MUR shall have the right to re-negotiate the freight rate with Gimpro. Likewise should the index fall below USD10,000 per day then Gimpro shall have the right to re-negotiate freight rate with MUR. This provision shall not affect Gimpro's obligation to pay any previous outstandings on the m.v. "Sea Life" Charter-Party dated 21st March 2005 or any subsequent shipments or outstandings from MUR due to Gimpro.

**Clause 27**

Stowage of sling bags to be drop stowed. Vessel/Master to reject (prevent loading) all sling bags which are not in perfect condition and supplies to replace the same.

**Clause 28**

Load to be one safe berth Mundra or one safe berth Kandla or one safe berth Sangi in Charterer's option. The option to load at Sanghi to apply if and when port ready for deep sea shipping operations giving safe entry and berth for vessels up to about 170m and 10.5 m draft.

Discharge to be one safe berth Mayotte and one safe anchorage Moroni and/or one safe berth Mutsamudu. Where the option to discharge at all three ports is exercised by Charterers, the discharge rotation is to be one safe berth Mayotte and one safe anchorage Moroni and one safe berth Mutsamudu, except when Moroni anchorage occupied/unsuitable, in which case vessel to discharge one safe berth Mutsamudu first. 11 metres SWAD draft guarantee by Charterers at first discharge port, Mayotte.

**Clause 29**

Tally to be for Charterer's account.

**Clause 30**

Each cargo to be in 16/18,000 metric ton sizes, cargo quantity to be loaded to be advised by Owners when nominating the vessel. Owners to declare exact cargo tonnage required minimum 10 days in advance of ship's ETA.

**Clause 31**

The shipment schedule to be six shipments with shipments to be approximately every two months commencing October 2005.

Owners shall hold the option not to ship cargo that would entail vessel discharging Comoro Islands during the rainy season December – February. Should Charterers wish a ship to discharge during this period then terms/conditions to be mutually discussed/agreed.

## ADDITIONAL CLAUSES TO THE MUR/GIMPRO
## CONTRACT OF AFFREIGHTMENT
## DATED LONDON 9TH AUGUST 2005

**Clause 32**

Demurrage USD12,000 per day or pro rate/half despatch working time saved both ends.

Demurrage/despatch is to be settled within 30 days of completion of discharge and agreement of laytime statements.

**Clause 33**

Charterers are to have the use of any dunnage on board the ship.  Any lashing/dunnage/kraft paper required for safe care of cargo to be for Charterer's account.

**Clause 34**

During currency of this contract MUR will not ship any other cement to the Comoro Islands with other companies without Charterer's prior consent and Gimpro will likewise give MUR exclusivity for all shipments to Comoros.

**Clause 35**

Whilst at discharge in Moroni and Mutsamudu, Owners to make available office space on board to accommodate Charterer's supercargo free of cost.  Owners are to also make available cabin for Charterer's supercargo if requested for transit between the Islands. Charterers to pay at cost, max $15.00 per day, and meals at cost, max $10.00 per day for such accommodation and victualling.  Whilst discharging in Comoro outer islands the vessel to provide meals for up to 6 people on board at total cost of $30 per day total.

**Clause 36**

War risk premium, as assessed on ship's hull and machinery, by virtue of the ship trading to and between Indian and Comoro waters to be for Charterer's account.  Charterers only to pay upon receipt of original invoices which to include Owner's discount, if any, as if Owners were trading for their own account.  Such insurance shall also not exceed rates as obtainable at Lloyds of London.

War Risks ("Voywar 1993")

(1)    For the purpose of this Clause, the words:
     (a)  The "Owners" shall include the shipowers, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and
     (b)  "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all Vessels or imposed selectively against Vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the vessel.

4

ADDITIONAL CLAUSES TO THE MUR/GIMPRO
CONTRACT OF AFFREIGHTMENT
DATED LONDON 9TH AUGUST 2005

Clause 36 (cont'd)

(2)     If at any time before the Vessel commences loading, it appears that, in the reasonable
judgement of the master and/or the Owners, performance of the Contract of Carriage,
or any part of it, may expose, or is likely to expose, the Vessel, her cargo, crew or other
persons on board the Vessel to War Risks, the Owners may give notice to the
Charterers cancelling this Contract of Carriage, or may refuse to perform such part of it
as may expose, or may be likely to expose, the Vessel, her cargo, crew or other
persons on board the Vessel to War Risks; provided always that if this Contract of
Carriage provides that loading or discharging is to take place within a range of ports,
and at the port or ports nominated by the Charterers the Vessel, her cargo, crew, or
other persons onboard the Vessel may be exposed, or may be likely to be exposed, to
War Risks, the Owners shall first require the Charterers to nominate any other safe port
which lies within the range for loading or discharging, and may only cancel this
Contract of Carriage if the Charterers shall not have nominated such safe port or ports
within 48 hours of receipt of notice of such requirement.

(3)     The Owners shall not be required to continue to load cargo for any voyage, or to sign
Bills of Lading for any port or place, or to proceed or continue on any voyage, or on any
part thereof, or to proceed through any canal or waterway, or to proceed to or remain at
any port or place whatsoever, where it appears, either after the loading of the cargo
commences, or at any stage of the voyage thereafter before the discharge of the cargo
is completed, that, in the reasonable judgement of the Master and/or the Owners, the
Vessel, her cargo (or any part thereof), crew or other persons on board the Vessel (or
any one or more of them) may be, or are likely to be, exposed to War Risks. If it should
so appear, the Owners may by notice request the Charterers to nominate a safe port
for the discharge of the cargo or any part thereof, and if within 48 hours of receipt of
such notice, the Charterers shall not have nominated such a port, the Owners may
discharge the cargo at any safe port of their choice (including the port of loading) in
complete fulfilment of the Contract of Carriage.  The Owners shall be entitled to recover
from the Charterers the extra expenses of such discharge and, if the discharge takes
place at any port other than the loading port, to receive the full freight as though the
cargo had been carried to the discharging port and if the extra distances exceeds 100
miles, to additional freight which shall be the same percentage of the freight contracted
for as the percentage which the extra distance represents to the distance of the normal
and customary route, the Owners having a lien on the cargo for such expenses and
freight.

(4)     If at any stage of the voyage after the loading of the cargo commences, iappears that,
in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo,
crew or other persons on board the Vessel may be, or are likely to be, exposed to War
Risks on any part of the route (including any canal or waterway) which is normally and
customarily used in a voyage of the nature contracted for, and there is another longer
route to the discharging port, the Owners shall give notice to the Charterers that this
route will be taken.  In this event the Owners shall be entitled, if the total extra distance
exceeds 100 miles, to additional freight which shall be the same percentage of the
freight contracted for as the percentage which the extra distance represents to the
distance of the normal and customary route.

5

ADDITIONAL CLAUSES TO THE MUR/GIMPRO
CONTRACT OF AFFREIGHTMENT
DATED LONDON 9TH AUGUST 2005

Clause 36 (cont'd)

(5)     The Vessel shall have liberty:-

(a) to comply with all orders, directions, recommendations or advice as to departure,
arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge
of cargo, delivery or in any way whatsoever which are given by the Government
of the Nation under whose flag the Vessel sails, or other Government to whose
laws the Owners are subject, of any other Government which so requires, or any
body or group acting with the power to compel compliance with their orders or
directions;

(b) to comply with the orders, directions or recommendations of any war risks
underwriters who have the authority to give the same under the terms of the war
risks insurance;

(c) to comply with the terms of any resolution of the Security Council of the United
Nations, any directives of the European Community, the effective orders of any
other Supranational body which has the right to issue and give the same, and
with national laws aimed at enforcing the same to which the Owners are subject,
and to obey the orders and directions of those who are charged with their
enforcement;

(d) to discharge at any other port any cargo or part thereof which may render the
Vessel liable to confiscation as a contraband carrier;

(e) to call any other port to change the crew or any part thereof or other persons on
board the Vessel when there is reason to believe that they may be subject to
internment, imprisonment or other sanctions;

(f) where cargo has not been loaded or has been discharged by the Owners under
any provisions of this Clause, to load other cargo for the Owners' own benefit and
carry it to any other port or ports whatsoever, whether backwards or forwards or
in a contrary direction to the ordinary or customary route.

(6)     If in compliance with any of the provisions of sub-clauses (2) to (5) of this Clause
anything is done or not done, such shall not be deemed to be a deviation, but shall be
considered as due fulfilment of the Contract of Carriage.

Clause 37 – Notices/Information/Documents Required

This requirement is to be updated for each shipment by Charterers.

For the Charterers
By telephone authority
JOLASRY (FRANCE)
45, Boulevard de Paris
92400 COURBEVOIE
as brokers

For/and on behalf of owners
By Telegraphic Authority
MUR SHIPPING
LONDON LIMITED

_____          _____
Charterers                       Owners

## IN THE MATTER OF THE ARBITRATION ACT 1996

## AND

## IN THE MATTER OF AN ARBITRATION

## BETWEEN:

MUR SHIPPING BV of the Netherlands

Claimants
(Owners)

and

GIMPRO NEGOCE of France

Respondents
(Charterers)

## "SEA BREEZE" CoA dd 9.8.05

## FINAL AWARD

**WHEREAS:**

(A)   Pursuant to a contract of affreightment on the Gencon 1976 form, with amendments, dated 9th August, 2005, the claimants ("the owners") nominated to the respondents ("the charterers") the ship "SEA BREEZE" for a voyage on terms and conditions more particularly set out therein.

(B)   A dispute arose concerning claims by the owners for deadfreight and

1



demurrage totalling US$177,783.61, liability for which the charterers denied. The parties agreed to refer the said dispute to arbitration in London in accordance with the LMAA Small Claims Procedure. They agreed that I, the undersigned Bruce Harris of Flat 101, 7 High Holborn, London, WC1V 6DR should be appointed arbitrator pursuant to that Procedure in order to determine the said dispute, and I accepted that appointment. The seat of the arbitration is England.

(C)  The parties' representatives provided me with written submissions and documents in accordance with the said Procedure.  Neither party requested an oral hearing.

**NOW I,** the said Bruce Harris, having taken upon myself the burden of this reference and having carefully and conscientiously read and considered the submissions and documents put before me and given due weight thereto, and for the reasons set out in the document annexed hereto which forms part hereof, **DO HEREBY MAKE, ISSUE AND PUBLISH** this my **FINAL AWARD** as follows:

1.    **I FIND AND HOLD** that the owners' claims succeed in full.

2.    **I THEREFORE AWARD AND DIRECT** that the charterers shall forthwith pay to the owners the sum of US$177,783.61 together with interest thereon at the rate of 7% per annum compounded at three-monthly rests from 1st December, 2006 until the date of payment hereunder.

3.    **I FURTHER AWARD AND DIRECT** that the charterers shall bear and pay their own and £2,000 in respect of the owners' recoverable costs of this reference **AND** that they shall reimburse to the owners the costs of this my Award, £1,500, which the owners have already paid to me.

4.   **FURTHER** the charterers are to pay the owners interest on (i) the £1,500 costs hereof and (ii) the £2,000 payable in respect of the owners' costs, at the rate of 7% per annum compounded at three-monthly rests, from 1st September, 2006 in the case of (i) and from the date hereof in the case of (ii), in both cases until the date of payment by the charterers to the owners.

**GIVEN** under my hand this 8th day of January, 2007

..........................................
Sole Arbitrator

..........................................
Witness

3

**"SEA BREEZE" CoA dd 9.9.05**

**REASONS**
for, and forming part of

**FINAL AWARD**

1.  This ship was nominated to perform under this contract a voyage for the carriage of a cargo of bagged cement from India to the Comoros. Two disputes arose. The owners claimed deadfreight on a quantity of cargo short-shipped (alternatively demurrage they said would have been earned if the ship had waited for the balance of cargo), whereas the charterers claimed damages in respect of short shipment. The owners also claimed discharging port demurrage, the amount of which was in dispute.

2.  It seems to me that in fact the case is, in respect of both disputes, capable of being analysed and resolved fairly simply. In view of that, and considering also that this is a SCP case where the costs are limited and where there is no possibility of appeal, plus the fact that both sides are well aware of the arguments, I do not propose in these Reasons to go into an elaborate discussion of the case, but will confine myself to what seem to me to be the essential elements.

3.  *Deadfreight*
    Essentially, the owners said that the ship sailed when she did because she had been ordered off the berth by the port authority because cargo was not being loaded quickly enough and no further cargo was immediately available, and that had she waited to re-berth and complete the remaining 800-odd tonnes of cargo the demurrage that would have been incurred would have exceeded, by a considerable

1

margin, the deadfreight claimed. That much, at least, did not seem to be disputed by the charterers. However, they contended that the off-berthing (and subsequent sailing) occurred because the owners' agents decided to book a pilot when they should, the charterers said, have left the ship alongside, in which event she would have completed later the same day.

4. At first blush I am led to wonder why owners' agents should take such a step unless there was good reason to do so. Inherently, therefore, it seems to me that this explanation is unlikely. And when I examine what was going on, it seems to me wholly improbable.

5. Loading had been proceeding at rates that varied over the 6 or so days involved, and on 3 of those days had not met the port's minimum requirements. The charterers sought to show that overall, as a matter of averaging, those requirements were met, but I accept the (unanswered) assertion made for the owners that what the port is interested in is actual daily rates, not averages: that plainly makes a lot of sense in a busy port like Kandla.

6. On 9th November, as I see it because of this slowness, the port traffic manager issued a letter to the ship ordering her off the berth that day. The port traffic manager's daily meeting that day was attended by both owners' and shippers/charterers' agents. The latter gave assurances that they would load in accordance with the port's minimum norms. The ship was not in fact off-berthed that day. It seems that she (or, rather, the shippers/charterers) was given another chance.

7. However, the loading rate during that day did not meet the port's minimum requirement and on 10th November the traffic manager again

2

said that, because of the heavy congestion at the port, the ship must go to a buoy mooring the next morning. Later that day another letter ordering the ship to shift, this time early on 11th November, was issued. No one from the shippers/charterers' agents attended the 10th November meeting, so it was not possible to give any assurances to the traffic manager as to availability of cargo or as to loading rates, in an attempt to get a further indulgence.

8.   The owners' agents then booked a pilot for the morning of 11th November and the ship was off-berthed that morning. The owners showed that port orders, such as the one given here, must be obeyed, as otherwise there can be serious consequences. Their agents were, they said, bound to organise a pilot once the second letter had been issued by the traffic manager, given the failure of those on the shippers/charterers' side to do anything to persuade him to cancel the order given.

9.   It may be, as the charterers asserted, that the shippers were in fact planning to complete loading during the second shift on 11th November. But, in the absence of anything done on their side to persuade the traffic manager to withdraw his direction to off-berth the ship, whether at the 10th November planning meeting or otherwise, that intention does not carry the matter any further.

10.  The first question of law that I have to answer is, I think, whether the owners were in any way in breach of contract. I cannot conclude, against the background summarised, that they were. It may not be without significance that the charterers did not seek to identify any breach by reference to the charter terms, though I acknowledge of course that their submissions were not made by lawyers. Nevertheless it does seem to me to say something about their complaint that they could not point to any charter provision except the failure to load a full cargo.

3

11.  As I see it, on the balance of probabilities that failure was brought about proximately by the shippers/charterers' agents failure to attend the 10th November meeting, or to take other relevant steps, assuming always that if they had done so they would have been able to get further indulgence from the traffic manager. And, behind that immediate cause, it resulted from the fact that the daily loading rate was not what was required by the port, and perhaps also from the fact that on 11th November there appears to have been no further cargo in the port area (though whether, if there had been, that would have changed things, seems unlikely).

12.  The charterers cannot rely upon their own failures, as just specified, in order to hold the owners responsible for what, on the face of it, seems to be a breach of contract (failure to load a full cargo). So I cannot hold that the owners were in fact in breach; or if they were technically in breach, they cannot be liable to the charterers for any losses suffered as a result. It follows that the charterers' effective counterclaim for losses said to have been suffered by the cargo being shut out cannot succeed in any event.

13.  What, though, of the owners' deadfreight claim? The ship did not leave the berth on the charterers' orders: she left because the port ordered her to. That came about because of the matters mentioned in paragraph 11. But it was not even the leaving of the berth that led directly to the ship not completing her loading: she could have done that at the cost of a number of days on demurrage which, understandably, the charterers preferred to avoid. Indeed the owners suggested loading from barges at anchorage, but that option was not taken up.

14.  The charterers did not suggest, in the arbitration, that the ship should have stayed at the buoys and waited, or that she should have

completed loading from barges. Plainly therefore they were satisfied that, in the prevailing circumstances, it was right for the ship to sail. I have held that the owners were not in breach of contract in relation to the off-berthing and that this was brought about by deficiencies on the shippers/charterers' side; and that the charterers chose not to keep the ship at the loading port. Accordingly I conclude, although not without a little hesitation, that it was the charterers who were in breach by not loading the full contractual cargo and they must therefore be liable for deadfreight.

15.  The owners' claim in this respect was put on a basis that was apparently generous to the charterers (they might arguably have claimed for another 100 tonnes), and the charterers avoided a substantial liability for loading port demurrage. They should not, therefore, feel too aggrieved at the outcome in the light of my conclusions on liability. As to those, I can see the charterers will no doubt feel unhappy; but on the evidence I do not see what other conclusions I could reach. Apart from the papers that were put before me, which are pretty persuasive in support of my views, I go back again to my starting point: it seems to me inherently unlikely that the owners' agents (or even, for that matter, the owners themselves) would have taken it upon themselves effectively to have the ship removed from the berth if that did not seem to them necessary. I cannot see what motivation they might have had for such a posture.

16.  *Discharging port demurrage*

The owners claimed that $144,450 demurrage was incurred at the discharging ports. The charterers said that the ship's equipment was defective, that by working overtime they managed to save 7.66 days but 4 of those were lost due to container ships being given priority, and they claimed credit for the remaining 3.66 days at the demurrage rate, as well as for $30,000 overtime expenses. I am not sure that I

5

fully understand the notions behind this calculation, nor its intended ultimate effect. At the end of the day, though, this does not matter because of the view I take of the dispute.

17.  The charterers' complaint was that discharging proceeded slowly because the ship's derricks were so slow, having what they described as a "poor cycle time". They said the owners knew, from previous experience, about discharging conditions at these ports. I think the charterers implicitly suggested that the owners were therefore bound to provide gear that would enable the ship to discharge, in those rather particular conditions, at a rate of at least 750 tonnes per day which, the charterers said, would have resulted in no demurrage being incurred except the four days lost due to container ships.

18.  Again, though, the first question to be asked is whether there is any breach of contract. Discharging was (as, indeed, was loading) a matter for the charterers under this FIOS contract. Further, it was up to the charterers which discharge ports they nominated and used. The contract contained no warranty by the owners as to discharging capabilities of the ships to be nominated save, in clause 23 "Minimum 10 ton cranes, ship to have 1 crane to serve each hatch simultaneously." "Sea Breeze" of course had derricks, not cranes, but their lifting capacity was certainly not in breach of this provision.

19.  The derricks were not in themselves defective, as I see it, so as to amount to a breach of some implied obligation as to general workability: it was simply that in the circumstances prevailing at the discharging ports they were not, apparently, able to give discharge at the rate the charterers would have preferred. I am sorry, but I do not see that any breach of contract by the owners has been shown. Moreover, when the owners nominated this ship, they gave detailed

6

particulars of her gear to the charterers, including "4 x 35 ts heavy cargo derricks rigged according to the double topping lift system with max. outreach over the ship's side 6m. 1 derrick each serve only one hatch. 1 x 90 ts heavy cargo derrick serve 2/3 hatches with max. outreach over the ship's side 7.20m."

20. The charterers ultimately accepted "Sea Breeze" but not before they had asked about "speed of derricks (double topping lift system?)" and said that the outreach of the derricks must be "not less than the one of a mk2 freedom". The owners responded "Speed of Derricks - double topping system. This is the normal system that is used for derricks operation there is no special system for this particular vessel" and also pointed out that there is no outreach requirement in the contract (although, as a matter of fact, it appears to me that there could be no practical complaint about outreach, regardless of the contract's requirements, since it was at least as great as the charterers requested). It was against that background that the charterers accepted this ship for performance under the contract.

21. In those circumstances, and quite apart from the fact that I cannot see that the owners were in breach, the charterers cannot possibly complain about the way the ship's gear performed. If they did not realise, from the description given to them, what would be involved, that is - to put it colloquially, and somewhat harshly - their problem. If they did not like this ship as described to them, they should not have accepted her. If they had wanted to impose some specific obligations on owners as regards the gear it was up to them to seek to do that in the original contract, or as a condition of accepting "Sea Breeze".

22. As was argued for the owners, having accepted this ship the charterers are estopped from complaining about any shortcomings she might,

7

from their point of view, have had which should have been apparent from the description given to them.

23.   Laytime and demurrage count in accordance with a contract's terms unless there is a specific exception or unless delay can be shown to have been caused by an owners' contractual default. Neither could be shown here, and it had to follow that the owners' demurrage claim succeeded in full.

24.   I am sure the charterers will be as disappointed at the outcome of this arbitration as they must have been at the voyage generally. I have sympathy with them because what happened was not, I feel, their personal fault. But sympathy is not enough: a tribunal has to decide liabilities in accordance with what it sees to be the facts and the law, and I have no doubt here that, on that basis, the owners have to succeed.

25.   It follows that the owners are also entitled to a sum in respect of their costs and the costs of the Award.